## SMITH v. JONES.

### DECISION OF THE COURT.

1. AUTOMOBILES—MITIGATION OF DAMAGES—EXEMPLARY DAMAGES— JOINT TORT-FEASORS.

Judgment for defendants in actions by husband and wife against operator and owner of car which injured the wife when car was driven against porch where she was sitting with her children is reversed per T. E. BRENNAN, C. J., and DETHMERS, KELLY, T. M. KAVANAGH, and ADAMS, JJ., for improper instruction as to mitigation of damages; per T. M. KAVANAGH and ADAMS, JJ., additionally, for refusal to allow jury to consider question as to whether defendant owner's actions amounted to gross negligence or wilful and wanton misconduct on his part as a joint tort-feasor with the driver and for refusal to charge the jury as to exemplary damages; and per BLACK, J., for refusal to submit to jury issue as to whether both defendants were joint tort-feasors according to common-law standards.

<hr />

REFERENCES FOR POINTS IN HEADNOTES

*Decisions of the Court.*

[1] 8 Am Jur 2d, Automobiles and Highway Traffic, §§ 598, 599.
22 Am Jur 2d, Damages §§ 200–202, 205.

*Separate Opinions.*

[2] 5 Am Jur 2d, Appeal and Error § 545.
[3] 8 Am Jur 2d, Automobiles and Highway Traffic § 598.
[4] 22 Am Jur 2d, Damages §§ 200–202, 205.
[5, 6, 8] 53 Am Jur, Trial § 579.
[7] 39 Am Jur, New Trial §§ 26–29.
[9] 22 Am Jur 2d, Damages §§ 236, 244.
[10] 7 Am Jur 2d, Automobiles and Highway Traffic § 12.
[11] 8 Am Jur 2d, Automobiles and Highway Traffic § 487.
[12, 13, 16] 8 Am Jur 2d, Automobiles and Highway Traffic §§ 487, 598.

SEPARATE OPINION.

T. E. BRENNAN, C. J., and DETHMERS and KELLY, JJ.

2. APPEAL AND ERROR—SAVING QUESTION FOR REVIEW—MOTION FOR NEW TRIAL.

A motion for new trial is not necessary to preserve for review alleged errors ruled on by the trial judge.

3. AUTOMOBILES — NEGLIGENCE — OWNER LIABILITY — GROSS NEGLIGENCE — INSTRUCTIONS TO JURY.

*Trial court was correct in refusing to instruct jury as to gross negligence and exemplary damages in action founded on owner liability statute since statute which makes owner liable for negligence of one driving automobile with his consent does not impute driver's gross negligence to owner (CLS 1961, § 257.401).*

4. DAMAGES—PERSONAL INJURIES—MITIGATION.

A plaintiff in a personal injury action is under a duty to mitigate personal injury damages by obtaining proper medical or surgical treatment.

5. SAME—INSTRUCTIONS—PERSONAL INJURY—MITIGATION.

Instruction to jury which included statement that plaintiff's physician in his deposition had recommended surgery for plaintiff was erroneous since it presented a factual issue as to plaintiff's duty to mitigate her damages by obtaining medical treatment, an issue not presented by the evidence.

6. TRIAL—INSTRUCTIONS—EVIDENCE.

An instruction to a jury assuming the existence of evidence not presented in the case is erroneous and it is impossible to determine on review the effect of such an instruction on the minds of the jury.

---

REFERENCE FOR POINTS IN HEADNOTES

[14, 15] 8 Am Jur 2d, Automobiles and Highway Traffic §§ 524, 572, 599, 674, 675.
[17] 8 Am Jur 2d, Automobiles and Highway Traffic § 564.
[18, 19] 22 Am Jur 2d, Damages §§ 243, 244, 249–251.
[20] 22 Am Jur 2d, Damages § 263.
[21] 22 Am Jur 2d, Damages §§ 243, 249.
[22] 22 Am Jur 2d, Damages § 237.
[23] 22 Am Jur 2d, Damages § 251.
[24] 22 Am Jur 2d, Damages §§ 244, 246.
[25] 22 Am Jur 2d, Damages § 270.
[26] 8 Am Jur 2d, Automobiles and Highway Traffic §§ 994–1006.
[27] 22 Am Jur 2d, Damages §§ 345, 361.
[28] 8 Am Jur 2d, Automobiles and Highway Traffic § 599.

7. New Trial—Error—Different Result.

A new trial is justified if error committed is such that the result might well have been different if the error had not been committed.

8. Damages — Instructions — Personal Injury — Previous Condition.

Instructions to jury in personal injury action that they could find no damages for injured plaintiff if they found that injuries of plaintiff were related to an earlier condition were erroneous where no evidence of lasting effects of the previous condition had been presented.

9. Same — Exemplary Damages — Automobiles — Negligence — Personal Injury.

*Exemplary damages have been allowed in varied fact situations in this State but have never been allowed in a claim for personal injuries suffered in an automobile collision.*

10. Automobiles—Negligence—Guest Passenger—Common Law—Statutes.

*The legislature has extensively provided for rules of the road for automobiles because the common law developed before the automobile; thus, in automobile accident cases, except for guest passenger actions, the Supreme Court has abided by the legislative enactments and rules in determining questions of negligence instead of requiring the trial court to first determine if there were negligence and then the amount or kind of negligence.*

11. Same—Gross Negligence—Guest Passenger—Exemplary Damages—Recovery.

*Gross negligence or wilful and wanton misconduct are referred to by the legislature only in the guest passenger act and this provision was not for the purpose of giving an injured guest an added right to exemplary damages but was intended to limit recovery by the guest passenger to situations where there was proof of gross negligence or wilful and wanton misconduct (CLS 1961, § 257.401).*

Separate Opinion.

T. M. Kavanagh and Adams, JJ.

See headnotes 2, 4–8.

12. Automobiles — Statutes — Negligence — Owner's Liability — Gross Negligence — Imputed Negligence.

*Statute imposing liability upon the owner of an automobile for the negligence of one driving an automobile with the owner's*

*consent does not impute driver's gross negligence to the owner (CLS 1961, § 257.401).*

13. SAME—STATUTES—GUEST PASSENGER—GROSS NEGLIGENCE.

*State statute imposes civil liability on the owner of a motor vehicle which causes injury while being negligently driven by another only where the operation is with the owner's consent and in the case of guest passengers, only if the injury was caused by gross negligence or wilful and wanton misconduct of the owner or operator of the vehicle (CLS 1961, § 257.401).*

14. SAME—OWNER'S CONTROL—JOINT TORT-FEASOR WITH DRIVER.

*An owner's stipulation that a driver could use the owner's vehicle only when accompanied by the owner allows a jury to conclude that the owner had the right of control of the vehicle at all times and that he was a joint tort-feasor with the driver upon the occurrence of an accident (CLS 1961, § 257.401).*

15. SAME—RIGHT OF CONTROL—LIABILITY FOR NEGLIGENT OPERATION —OWNER'S DUTY.

*Right of control of a motor vehicle rather than actual exercise of control determines owner's liability for negligent operation of an automobile and the fact that an owner refrained from directing or encouraging reckless operation of his automobile does not change liability, for it is the owner's duty to exercise reasonable care to control conduct of third persons using his property for the protection of others where he knows of, or as a reasonable man should know of, the necessity of doing so (CLS 1961, § 257.401).*

16. SAME—CONSTRUCTION OF STATUTES—GUEST PASSENGER—GROSS NEGLIGENCE.

*The guest passenger statute reference to gross negligence or wilful and wanton misconduct is a test as to whether there was wilful and wanton disregard for public safety in the operation of a motor vehicle; thus, where an automobile in which the owner was riding crashes into a porch of a house, a jury could find wilful and wanton misconduct and disregard for the safety of the public if a guest passenger was involved; likewise, such conduct may be found by the jury to be wilful and wanton with regard to the occupants of the porch (CLS 1961, § 257.401).*

17. SAME—NEGLIGENCE—CONCERTED ACTION—JOINT TORT-FEASOR— GUEST PASSENGER ACT.

*Injuries suffered by plaintiff, when an automobile operated under the supervision and presence of its owner crashed into the*

porch on which plaintiff was seated, could be found by a jury to be the result of concerted action of the driver and owner of the vehicle, and both parties could be held liable as joint tort-feasors for all acts caused by the negligent driving, for the misconduct was no different in causal relation to the injuries of plaintiff than it would be under the guest passenger act (CLS 1961, § 257.401).

18. Damages—Exemplary Damages—Injuries to Feelings—Malice—Recklessness.

Damages for injury to the feelings of a person injured are recoverable in addition to damages to person, property, or reputation, where there is malice or wilful or wanton misconduct, carelessness, or negligence so great as to indicate a reckless disregard of the rights or safety of others.

19. Same—Exemplary Damages—Injuries to Feelings—Gross Negligence.

Amount of damages recoverable for injured feelings, which includes shame, mental anxiety, insulted honor, suffering, and indignation consequent on the wrong, may be increased by the vindictive feelings, or degree of malice, recklessness, gross carelessness, or negligence of defendant.

20. Same—Actual Damages—Exemplary Damages—Instructions.

An increase in damages dependent upon conduct of defendant must be considered as actual damages although usually spoken of as exemplary, vindictive, or punitory damages; however, the amount to be recovered as exemplary damages must rest in the fair and deliberate judgment and discretion of the jury acting upon their sense of justice in view of the circumstances and as aided by instructions from the court which tend to prevent fanciful damages or those so remote as not fairly resulting from the injury.

21. Same—Exemplary Damages—Injuries to Feelings—Physical Injury—Limitation.

Exemplary damages may be awarded in a proper case for injury to the feelings of plaintiff, but the right of recovery is restricted to the person who has received the physical injury.

22. Same—Exemplary Damages—Punishment—Recovery.

Exemplary damages are not allowed in order to punish defendant, but the right to recover such damages arises out of the outrageous nature of defendant's acts.

23. SAME—EXEMPLARY DAMAGES—INTENT TO INJURE—NEGLIGENCE.

. *Exemplary damages may be awarded despite defendant's lack of intent to do injury to a specific person, where the act done, from its nature, must be expected to result in mischief or where the negligence is so great as to indicate a reckless disregard of the rights and safety of others.*

24. SAME—EXEMPLARY DAMAGES—INJURIES—RIGHT TO RECOVERY—VIOLATION OF LAW.

*Plaintiff may recover damages for both physical and mental injury suffered when defendants ran an automobile into the porch upon which plaintiff was seated, where defendants had deliberately flaunted the law by driving while drinking and driving in a reckless manner.*

25. SAME—EXEMPLARY DAMAGES—PLEADING—COMPLAINT.

*Exemplary damages do not have to be specially pleaded; thus, where the complaint avers the gross negligence and wanton misconduct of defendants and that plaintiff suffered personal injuries, both physical and mental, which caused past and future pain and suffering, the complaint is sufficient to award exemplary damages.*

26. AUTOMOBILES—EVIDENCE—PERSONAL INJURY—JURY.

*Testimony by a mother that she was sitting on the porch with her two small children when a car ran into the porch, that blood was running down her leg and that she thought one of the children was under the car held, testimony sufficient for a jury to find that the mother suffered both physical and mental injury.*

27. DAMAGES—EXEMPLARY DAMAGES—AUTOMOBILES—NEGLIGENCE—APPEAL AND ERROR—GROSS NEGLIGENCE—JURY QUESTION.

*Trial judge erred in refusing to charge the jury as to exemplary damages and in refusing to allow the jury to consider whether the action of the owner of an automobile in loaning his vehicle to another, with the stipulation that it could only be used in the presence of the owner, amounted to gross negligence or wilful and wanton misconduct by the owner when the driver, accompanied by the owner, crashed into plaintiff's porch and negligently injured plaintiff.*

28. Automobiles—Appeal and Error—Negligence—Gross Negligence—Common Law—Joint Tort-Feasors—Jury Question.
    *Trial judge erred in refusing to allow a jury to consider whether the action of an owner of an automobile in loaning his vehicle to another, with the stipulation that it could only be used in the presence of the owner, rendered both the driver and the owner joint tort-feasors according to common-law standards, when the driver accompanied by the owner crashed into plaintiffs' porch and negligently injured plaintiff wife.*

Appeal from Court of Appeals, Division 3, Quinn, P. J., and Fitzgerald and Holbrook, JJ., affirming Kent, Vander Wal (John H.), J.  Submitted November 12, 1968.  (Calendar No. 5, Docket No. 51,752.)  Decided August 4, 1969.

6 Mich App 92, reversed and remanded.

Complaint by Ollie Mae Smith and Ollie Z. Smith, her husband, against Louis Jones and Heriberto Miranda, for personal injuries and medical expenses caused by automobile driven by Jones and owned by Miranda.  Verdicts and judgments for plaintiffs. Plaintiffs appealed to Court of Appeals.  Affirmed. Plaintiffs appeal.  Reversed and remanded for new trial.

*Marcus, McCroskey, Libner, Reamon, Williams & Dilley,* for plaintiffs.

*Cholette, Perkins & Buchanan (Edward D. Wells,* of counsel), for defendant Heriberto Miranda.

Kelly, J.  Plaintiff Ollie Mae Smith was injured on July 11, 1963, when an automobile owned by defendant Heriberto Miranda, and driven by named

defendant Louis Jones, struck the front porch of plaintiffs' residence where Ollie Mae Smith had been seated, causing a piece of wood to strike her on the leg.

Plaintiffs filed complaint against both Miranda and Jones seeking damages for injuries, pain and suffering, impairment of earning capacity, and the medical expense for care and treatment of Ollie Mae incurred by her husband, Ollie Z. Smith. Jones was never served with process.

A jury returned verdicts against defendant, Miranda, awarding Ollie Mae Smith $2,500, and her husband, Ollie Z. Smith, $719.85 for expense incurred in the care and treatment of his wife.

Judgments were entered on the verdicts and the trial court file discloses payments thereof to the Kent county clerk, who is holding same in escrow pending final determination of the case.

Plantiffs did not file a motion for new trial and appealed to the Court of Appeals.[1]

The Court of Appeals, affirming the trial court, stated (p 94):

"Plaintiffs appeal and assert a multitude of errors, some of which would clearly require reversal if the jury verdicts had not been in plaintiffs' favor. However, plaintiffs recovered and they made no claim below nor do they claim here that the verdicts were inadequate or against the weight of the evidence. No motion for new trial on the basis of inadequacy was made in the trial court. Since the errors complained of would only be prejudicial with respect to the amount of the verdicts, we believe *Davis* v. *Jermstad* (1957), 350 Mich 439, is dispositive of this appeal and we decline further comment on the errors asserted by plaintiffs."

Plaintiffs sought in the Court of Appeals and are presently seeking a decision reversing the trial

---

[1] *Smith* v. *Jones* (1967), 6 Mich App 92.

court's instruction on damages. *Davis* v. *Jermstad*, *supra,* is not "dispositive of this appeal." In *Davis* we held that (p 444) "the charge as given to the jury carefully and fully covered the material issues in the case."

In *Bunda* v. *Hardwick* (1965), 376 Mich 640, 672, we held that a motion for new trial was not necessary to preserve for appellate review alleged errors ruled upon by the trial judge.

We will consider in this appeal two claimed instructional errors, both of which were extensively discussed and argued in the "Proceedings In Chambers" by plaintiffs and defendant Miranda, namely:

(1) Was error committed by the trial court's refusal to permit the jury to consider the gross negligence of defendant Miranda and an award of exemplary damages to plaintiffs; and

(2) Did the trial court err in permitting the jury to consider and determine issues upon which no evidence was submitted.

## 1.

Plaintiffs call attention that:

"Both the unserved defendant, Jones, and Miranda were charged with wanton misconduct. The charge against Jones was based upon his manner of operating the Miranda vehicle immediately prior to and at the time of this collision. The charge against Miranda was based upon his knowingly permitting an intoxicated person to operate his automobile."

Plaintiffs analyze our decisions of the past by stating that "at first blush, it might appear" that our decisions before 1948[2] would sustain the trial

[2] *Wieczorek* v. *Merskin* (1944), 308 Mich 145; *Geib* v. *Slater* (1948), 320 Mich 316.

court's refusal to. permit the jury to consider exemplary damages, but that our decisions subsequent to 1948[3] establish the Court's error.

The *Peyton* v. *Delnay* and *Karney* v. *Upton Cases,* upon which plaintiffs rely, involved actions under the guest portion of the statute and not under the ownership liability provisions involved in this appeal.

In the *Peyton Case,* defendant claimed that if the driver was guilty of gross negligence, then under our *Wieczorek* and *Geib* decisions the owner would not be liable under CLS 1961, § 257.401 (Stat Ann 1968 Rev § 9.2101), holding that only ordinary negligence would be imputed to the owner.

This Court, in rejecting plaintiff's claim, and explaining the difference between the *Wieczorek* and *Geib Cases* and the *Peyton Case,* said (p 248):

"Appellants rely for a contrary view upon *Wieczorek* v. *Merskin,* 308 Mich 145; and *Geib* v. *Slater,* 320 Mich 316. Neither was a case involving suit by a guest passenger. Neither held that where the operator (driving with the owner's consent) was found guilty of gross negligence or wilful and wanton misconduct that this acted to relieve the owner of liability."

That the *Karney* v. *Upton* decision did not over-rule *Wieczorek* or *Geib* is evidenced by the following from that decision (p 265):

"It may be noted that the recent decision of this Court in *Peyton* v. *Delnay,* 348 Mich 238, is squarely in point. See, also, *Wieczorek* v. *Merskin,* 308 Mich 145."

. Under our decisions of the past, which we are reaffirming in the present appeal, we hold that the

---

3 *Peyton* v. *Delnay* (1957), 348 Mich 238; and *Karney* v. *Upton* (1958), 353 Mich 262.

trial court did not commit error in refusing to instruct on gross negligence and exemplary damages.

2.

We next consider the court's instructions regarding plaintiff Ollie Mae Smith's duty to minimize her damages by obtaining proper medical or surgical treatment. That such a duty exists is well established.[4]

A review of plaintiff Ollie Mae Smith's efforts to obtain such treatment discloses that within one hour after defendant's car struck the porch a neighbor drove her to the Grand Rapids Butterworth Hospital Emergency Department, where X-rays were taken which disclosed no broken bones in the leg; that two weeks later because of continuous pain she sought aid from Dr. Jones, of Grand Rapids, who prescribed the use of an elastic bandage to wrap the leg, some pills, and instructions to keep off the leg as much as possible and keep it elevated; that on August 23, 1963, she went from her home in Grand Rapids to the office of Dr. Lauretti, in Muskegon, who diagnosed her complaint as being a thrombophlebitis of the left leg, because either the nerves of the leg were somewhat inflamed or the diameter of the vein was smaller than ordinary; that because Dr. Lauretti felt physiotherapy was necessary, she went to a Mr. Beam, a physiotherapist in Grand Rapids, 19 times between September 4, 1963 and October 16, 1963, where whirlpool treatments and massage were administered; that Dr. Lauretti again examined plaintiff on October 18 and November 19, 1963, and on January 2, 1964; that her next visit to a doctor was on April 2, 1965, to a

[4] 48 ALR2d 346, 349, 350; *Poikanen v. Thomas Furnace Co.* (1924), 226 Mich 614; *Kricinovich v. American Car & Foundry Co.* (1916), 192 Mich 687.

Dr. Johnston; that Dr. Johnston, on August 23, 1965, operated and tied off a vein in plaintiff's leg.

Plaintiff was examined as a witness at the trial and on direct examination related her visits to Dr. Lauretti. Plaintiff's cross-examination was confined to a few questions in regard to a knee injury she received in 1961, and a swollen leg resulting from medical treatment in 1958. Nothing was said by plaintiff on direct examination that even implied that Dr. Lauretti had recommended surgery, and the only question about Dr. Lauretti which defendant asked her on cross-examination was whether her attorney told her "to see Dr. Lauretti in the fall of 1963 so you made two or three trips over there" to Muskegon.

In the opening statement to the jury, defense counsel stated:

"It is our claim and our theory that she knew she needed the operation as of January, 1964, and if it had been done at that time she would have been completely cured at least within a couple of months."

An extended discussion and argument between counsel took place in the judge's chambers previous to instructing the jury. It was plaintiffs' counsel's contention that there was no testimony that Dr. Lauretti ever advised plaintiff, or her counsel, that surgery was necessary.

The court read aloud to counsel from Dr. Lauretti's deposition as follows:

"*Q.* Does it respond readily to conservative treatment?

"*A.* If it doesn't—sometimes it does. But most often it doesn't. And if it doesn't then you have to think of other things.

"*Q.* Such as what?

"*A.* Surgery."

and then asked defendant's counsel,

"Do you claim that that [surgery] was conveyed to her?"

Defendant's counsel answered:

"No, but I claim the law is, if she feels, if the jury finds she failed to procure necessary treatment for whatever reason, if she failed to act as a reasonably prudent person, failed to procure medical treatment and the jury so finds, she cannot recover."

The court specifically charged the jury:

"In his deposition, the doctor from Muskegon [Dr. Lauretti] then recommended surgery. Whether that was communicated to the plaintiff or not is part of that deposition that was read to you."

The record sustains plaintiffs' contention that:

"Upon examination of the record, it is evident that there was no reference at all made to any knowledge on the part of Mrs. Smith that she should have surgery, nor of any opinion being expressed by Dr. Lauretti that she should have had surgery prior to the actual date of surgery. The most that is found in the record is a statement in Dr. Lauretti's deposition that was read into evidence at the trial, wherein he said upon cross-examination by Mr. Souter [defendant's attorney]:

"'Q. So that the next recommendation at that point would normally be surgery?

"'A. Yes.'

"This is *not* a statement by Dr. Lauretti that, at the time he last saw Mrs. Smith in January of 1964, he recommended surgery. It is merely an answer to Mr. Souter's question that ordinarily at the point to which Mrs. Smith's case had progressed, he would recommend surgery. The trial record is totally devoid of any indication that Dr. Lauretti ever made any recommendation of surgery, or, in fact, that Mrs. Smith ever had any idea that surgery might be

required prior to the initial examination by Dr. William L. Johnston."

We do not agree with defendant that "The jury might infer that the doctor had recommended surgery to plaintiff and she did not want it," nor do we agree with defendant's conclusion that: "Even if there were no evidence at all on the point, which is strenuously denied, then an intelligent jury would not make an erroneous finding on the point anyway."

Hospital records were introduced disclosing that five years before the accident here involved, plaintiff Ollie Mae Smith was hospitalized with chest pains of pleuritic nature and that on discharge (July 8, 1958) the summary sheet stated: "Final diagnosis atypical pneumonia. Thrombophlebitis." Further, that on June 12, 1961, plaintiff again came to the hospital complaining of her left knee which had been injured two weeks earlier in an automobile accident. In this regard plaintiff testified her left knee hit the dashboard of the car in which she was riding at the time of that accident.

The only medical testimony was given by Dr. Lauretti and Dr. Johnston.

The questions asked Dr. Lauretti on cross-examination in regard to either of the above mentioned hospital recorded incidents were confined to the following:

"*Q.* Would the fact that she had had, assuming that there had been a diagnosis of, a diagnosis of thrombophlebitis in 1958, would this be significant to you at all?

"*A.* I don't know that it would, because an accident the way she described, causing pain and swelling, at least I would think along the lines of an aggravation.

"*Q.* You mean that there had been a condition that this may have aggravated?

"*A.* Yes."

On direct examination, Dr. Johnston, after stating he had reviewed the above mentioned hospital records, and that those records disclosed there was no further finding of any thrombophlebitis after 1958, was asked whether he attached any significance to the 1958 thrombophlebitis with respect to the present case. He answered:

"Well, what I found at surgery certainly could have initiated with her initial injury. I have no way of evaluating what she had in 1958 but the fact that she went from 1958 until 1963 without any swelling, pain, cramps or any other diagnosis in the innumerable hospitalizations and innumerable clinic visits is pretty conclusive that this process she had in 1958 had subsided completely. It must have been a localized process, it did not ascend up her leg or give her enough scarring to produce this picture."

On cross-examination of Dr. Johnston, the following questions were asked and answers given:

"*Q.* Well, assuming she had the phlebitis that the hospital records show in 1958, do you mean that this would have completely cleared or disappeared?
"*A.* Yes. * * *
"*Q.* Do you feel that 1958 phlebitis was not significant then?
"*A.* I don't think it has any relationship to this [case]."

The court in its instructions to the jury in regard to defendant's claim, said:

"It is the claim of the defendant that what injuries Mrs. Smith complained of were not caused by this piece of wood coming in contact with her leg.

"It is the further claim of the defendant that she had a thrombus condition, thrombophlebitis condition back in 1958; that she was in an automobile accident in 1961 and that her thrombosis or

thrombophlebitis was not the direct result of any
negligence on the part of either Mr. Jones or Mr.
Miranda."

Further on in the instructions, the court stated,[5]
and again reiterated[6] that the jury could find that
plaintiff was not entitled to any damages even
though the evidence proved defendant's negligence.

The only evidence introduced other than that of
the doctors, that could in any way throw any light
upon the question as to whether plaintiff's operation
was caused by the act of defendant or because of her
condition previous to said act, was the testimony of
the plaintiff Ollie Mae Smith, which refuted defend-
ant's claim.

"An instruction not based on the evidence is er-
roneous in that it introduces before the jury facts
not presented thereby, and is well calculated to in-
duce them to suppose that such state of facts in the
opinion of the court is possible under the evidence
and may be considered by them." 53 Am Jur, Trial,
§ 579, pp 455, 456.

In *Fortner* v. *Koch* (1935), 272 Mich 273, 283, we
held that it is impossible to determine the effect upon
the minds of the jury resulting from an instruction
erroneously assuming the existence of certain facts.

---

[5] "If you should find that her injuries were the result of her
condition in 1963, was the result of what happened in 1958 or 1961,
and what happened in July 1963 had nothing to do with her condi-
tion of course then she cannot recover the damages that I have out-
lined to you, because, this defendant would be liable for only the
direct results or responsible for the damages that are directly trace-
able to the accident that happened on July 11, 1963."

[6] "But, if you should find that her condition in July and subsequent
months was a direct cause or relate back to what happened in 1958
and 1961 then of course they were not the direct result of this ac-
cident on July 11, 1963. * * *

"If on the other hand you find these injuries that she complained
of, were not caused by, — were not directly caused by the negli-
gence of Mr. Jones, if any, and that was solely due to her condition
in 1958 or 1961, of course then her resulting injuries and damages
were not a direct cause of this accident and she cannot recover."

We have also held that if the error is such that the result might well have been different if not committed, a new trial is justified. *Rouse* v. *Gross* (1959), 357 Mich 475, 481, 482.

Applying these above mentioned tests, we conclude that a new trial should be granted because of instructions which permitted the jury to consider and determine issues upon which no evidence was submitted.

Reversed and remanded for new trial. Costs to appellants.

## *ADDENDUM*

This addition to my opinion is written subsequent to receiving Justice Adams' and Justice Black's opinions.

The common-law liability of defendant Miranda was not considered in my original opinion because it was not raised in either the trial of this case or in the appeal to the Court of Appeals.

Plaintiffs, in their brief, admit that even though the evidence would sustain an instruction in regard to "the wanton misconduct of defendant Miranda," and an instruction in regard to "imputation of the wanton misconduct of defendant Jones to defendant Miranda," there still would remain the "critical issue" in regard to exemplary damages, by the statement to this Court:

"However, if the Court determines that the question of gross negligence should have been presented to and decided by the jury, then plaintiffs' entitlement to exemplary damages becomes a critical issue in the case."

Admitting that if the Court approves submitting to the jury the question of exemplary damages, it will be doing so for the first time, plaintiffs state:

"Although there are numerous Michigan cases in-
volving the allowance of exemplary damages under
varied fact situations, there are none directly in
point with reference to a claim for personal in-
juries sustained in an automobile collision."

The cases cited by Justice ADAMS do not refute
this statement.

The common law came into existence and was
developed before the day of the automobile. Realiz-
ing this, the Michigan legislature has by enactment
extensively provided for the "rules of the road" in
regard to driving, stopping, and parking. Up to
now we have abided by those rules in determining
the question of negligence in automobile accident
cases and have not placed the burden upon the trial
court or jury to first determine whether there was
proof of negligence and then determine the amount
or kind of negligence except in guest passenger
cases. Determining the question of the amount of
negligence is a major problem which has been
proven by the guest passenger cases that have been
appealed to this Court.

The only legislative reference to gross negligence
or wilful and wanton misconduct is in the guest pas-
senger statute and this provision was not included
for the purpose of giving to the injured guest an
added right to exemplary damages, but was inserted
in a restrictive sense, namely: that no guest passen-
ger could recover damages unless there was proof
of gross negligence or wilful and wanton miscon-
duct.

Nothing has been presented since my original
writing that causes me to conclude differently than
I did then, *i.e.*:

"Under our decisions of the past, which we are
reaffirming in the present appeal, we hold that the

trial court did not commit error in refusing to instruct on gross negligence and exemplary damages."

T. E. Brennan, C. J., and Dethmers, J., concurred with Kelly, J.

Adams, J. (*concurring in reversal and remand*). I agree with Justice Kelly that if a driver of an automobile is guilty of gross negligence, the owner would not be liable for such gross negligence under CLS 1961, § 257.401 (Stat Ann 1968 Rev § 9.2101) as only ordinary negligence would be *imputed* to the owner. In this case, however, we are concerned with the claimed tortious conduct of two persons— Louis Jones, the driver of the automobile that injured plaintiff Ollie Mae Smith, and Heriberto Miranda, the owner of the automobile, who was present in the automobile. The trial court refused to permit the jury to consider the question of whether Miranda's own actions amounted to wanton misconduct on his part and as to whether plaintiff Ollie Mae Smith was entitled to exemplary damages.

Upon the trial of this case, there was testimony that on the afternoon of July 11, 1963, Miranda and Jones met at a pool hall on South Division Street in Grand Rapids. Over a period of time, Miranda and another acquaintance, Shannon Anderson, made three trips to a nearby bar, consuming at least one bottle of beer on each trip. Jones accompanied them on at least one trip. Sometime after the third trip to the bar, Jones asked to borrow Miranda's 1955 Pontiac automobile to conduct some business. Miranda refused to loan the car. Jones made repeated requests. Miranda finally permitted him to use the car on the condition that Miranda accompany him. Jones drove a short distance. He then stopped to pick up a friend, Norris Darby. Darby

testified that upon entering the car, he was invited
to have a drink from an open bottle of wine that
was in the rear seat. After pulling away from the
curb, each of the men drank from the wine bottle
and the drinking continued during the trip from
Cass avenue to the point of collision.

Darby further testified that while Jones was driv-
ing west on Franklin street, he "told Louis Jones
to take it easy, I was not ready to die yet, because
he was zigzagging across the street. He almost hit
one or two cars, so I said take it easy or else let me
out." He said, "Ah, what is the matter, are you
chicken, or afraid, or something like that?" Darby
also testified that it seemed to him that Miranda
also told Jones to take it easy, or something like
that. Finally, he testified that when he first en-
countered Jones and Miranda on Cass avenue,
"there was no doubt about" the fact that they had
been drinking.

Minutes before the collision, which occurred at
approximately 4:55 p.m., Robert J. Miller, an attor-
ney, was stopped at a red light at the corner of
Franklin street and Jefferson avenue, headed west-
erly on Franklin street, when he first observed the
Miranda car. The car "pulled rapidly out of the
gasoline station, which is on the southwest corner
of Jefferson and Franklin, pulled into Franklin
street at a rapid speed, nearly hit a car that was
proceeding in a westerly direction, which car was
in the north lane on the westbound traffic. Having
barely missed that car it then proceeded to swerve in
a southwesterly direction into the south lane of the
westbound traffic and proceeded westward."

Miller saw the car stop at a red light at the Frank-
lin-Sheldon avenue intersection and observed that
the occupants were "laughing and talking boister-
ously." When the light changed, the Miranda car

pulled away "again at a rather rapid accelerated speed," and then continued west "at a greater speed and pulled away from me probably by a block or two." Miller watched the car continue west on Franklin street to the intersection of Grandville, it appearing "first as if the car was going to go directly through the intersection with the green light and go westward through the intersection but all of the sudden they made a quick turn to the right or north into Grandville avenue, were over the center line of Grandville avenue traffic and came into contact with another car which it hit."

At the time of the collision, William R. Maier, a self-employed accountant, was driving an automobile southbound on Grandville avenue, near the Grandville avenue-Franklin street intersection. He was stopped in the inner southbound traffic lane, waiting for the traffic signal to change to green for Grandville avenue. After the light changed to green, he remained stationary for a short time, and then "heard this squealing of brakes, noticed the Pontiac come around the corner at a high rate of speed," which he judged to be "between 40 and 50 miles an hour." As the Pontiac made the right turn from Franklin street to Grandville avenue, "it was leaning on, pretty close to a 30-degree angle and I just sat there hoping that it would miss me (Maier); and as it did hit the left front headlight of my car, the left front corner of my car [, it] careened off that over and hit a porch of a house on the east side of Grandville."

Maier testified that "Well, as we got the driver out he could barely stand up, and the odor of alcohol was all present around him. He couldn't talk clearly, as a matter of fact, he tried to say he was not even driving, and we just helped him out from behind the wheel." Maier also observed that "the

front seat passenger (Miranda) also smelled strongly of alcohol. As we opened the door there were some bottles fell out. There were other bottles in the car." The bottles were later identified as wine bottles.

John Corey was employed at a barber shop on the corner of the Franklin street-Grandville avenue intersection at the time of the collision. He heard "wheels squealing, going around the corner," then saw the Miranda vehicle "hit the car on the opposite side of the street, that would be the west side of Grandville avenue." He "could smell wine" on the person of the driver of the Miranda car; "it appeared that they had been drinking and as the door on the right hand side opened there I saw the wine bottle drop out."

Police Officer Richard A. Holmgren, who investigated the collision, observed that "all the individuals that were in the car, or had been in the car, had appeared or did appear that they had been drinking." And with respect to Jones and Miranda, "There was odors on both of their breath, which definitely were of an alcoholic content, I couldn't distinguish what they had been drinking; however, I do know they had been drinking."

CLS 1961, § 257.401 (Stat Ann 1968 Rev § 9.2101), to which Justice KELLY refers, relates to the civil liability of owners of motor vehicles for injury occasioned by negligent operation—imposing liability on the owner, where the motor vehicle is being driven by another, only if such operation is with the owner's consent and, in the case of an injured guest-passenger, imposing liability only if the injury is caused by the gross negligence or wilful and wanton misconduct of the owner or operator of the motor vehicle.

In this case, Miranda was present in the motor vehicle at all times prior to the accident. There is testimony that when Jones asked Miranda for the loan of his automobile, he was refused, that only after repeated requests by Jones did Miranda consent to allow him to use the automobile and then only if Miranda accompanied him. From such testimony as to the stipulation upon the use of the automobile by Jones, a jury could find that Miranda retained the right of control of the vehicle at all times and that he was therefore a joint tort-feasor with Jones.

Whether Miranda refrained from directing or encouraging the reckless operation of his car by Jones does not change his liability because it is the right of control rather than the actual exercise of it which is material. The rule is stated in 2 Restatement, Torts (Second), § 318, as follows:

> "§ 318. Duty of Possessor of Land or Chattels to Control Conduct of Licensee.
>
> "If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
>
> "(a) knows or has reason to know that he has the ability to control the third person, and
>
> "(b) knows or should know of the necessity and opportunity for exercising such control."

In the comment which follows the above section, this statement appears:

> "The duty to exercise reasonable care to control the conduct of third persons for the protection of others requires the actor to exercise his ability to

control such third person's conduct not only when he knows of the necessity for so doing, but also when as a reasonable man he should know of it."

See, also, *Dortman* v. *Lester* (1968), 380 Mich 80, 85, and *Parks* v. *Pere Marquette R. Co.* (1946), 315 Mich 38.

Although CLS 1961, § 257.401 (Stat Ann 1968 Rev § 9.2101) refers to "gross negligence or wilful and wanton misconduct" in connection with liability to a guest passenger, under this Court's most recent pronouncements as to the above quoted phrase, in *Peyton* v. *Delnay* (1957), 348 Mich 238, and *McKenzie* v. *McKenzie* (1965), 374 Mich 320, the test is a "wilful and wanton disregard for public safety." Applying the test to this case, and bearing in mind that the totality of the facts is to be considered— *Stevens* v. *Stevens* (1959), 355 Mich 363, and *Anderson* v. *Gene Deming Motor Sales, Inc.* (1963), 371 Mich 223—a jury could have found Jones guilty of gross negligence or wilful and wanton misconduct within the meaning of the statute if a guest passenger had been involved. Such conduct could equally be found to be wilful and wanton with regard to other persons—a pedestrian, the occupant of another automobile, the occupant of one's own front porch, *i.e.,* Mrs. Smith—as it would be to a guest passenger.

If the operation of the automobile by Jones was limited in that Miranda permitted such operation only under his supervision and presence, a jury could find that the injuries to Mrs. Smith resulted from a concert of action by Jones and Miranda in the wrongful operation of the motor vehicle. "Where there is concerted action toward a common end, both parties are liable for all acts within the scope of the undertaking." *King* v. *Herfurth* (1943), 306 Mich 444, 448. In *Benson* v. *Ross* (1906), 143

Mich 452, where plaintiff was injured by a stray bullet shot by 1 of 3 defendants, this Court said:

"There was testimony tending to show that the three defendants were acting in concert in an act, not only violating a city ordinance, but palpably and grossly negligent. If the jury found such concert of action, all would be liable as joint tort-feasors."

See, also, *McCoy* v. *DeLiefde* (1965), 376 Mich 198, and *Fisher* v. *Rumler* (1927), 239 Mich 224, 227, 228.

Miranda's misconduct (if found to exist) is no different in causal relation to the injuries inflicted on Ollie Mae Smith than it would be under the guest statute. Because a jury could find that Miranda had authority to act under the circumstances, it could also find that his conduct amounted to recklessness and a wilful and wanton disregard for public safety.

### Exemplary Damages.

Plaintiffs' attorney sought an instruction on exemplary damages.[1] The instruction is not a correct statement of the law with regard to exemplary dam-

---

[1] "I have previously instructed you that, should you find defendant Miranda guilty of gross negligence or willful and wanton disregard of public safety, then you may award Mrs. Smith what are called 'exemplary' damages.

"It is the law of Michigan that, when a person sustains injuries as a result of the gross negligence, or willful and wanton misconduct of another party, then the jury may award the injured person additional damages because of the gravity of the defendant's recklessness, willfullness, wantonness or gross negligence. No hard and fast rule can be laid down, properly measuring or limiting damages which you may award if you should find that defendant Miranda was guilty of gross negligence, except that they must not be oppressive, or such as to shock the common sense of fair-minded men, and they are therefore left to your reasonable discretion.

"Under the facts of this case, if you should find that defendant Miranda was guilty of gross negligence, or willful and wanton disregard of public safety, then any amount which you may choose to award Mrs. Smith as exemplary damages 'must rest in the fair and deliberate judgment and discretion of * * * [you as members of] * * * the jury acting upon * * * [your] own sense of justice in view of all the circumstances, both mitigating and aggravating, appearing in the case.' "

ages and plaintiff Ollie Mae Smith was not entitled
to have it given. Plaintiffs' attorney also made ob-
jection to the trial court's failure to give any in-
struction to the jury on exemplary damages. De-
fendant-appellee maintains that no instruction as to
exemplary damages should have been given.

The question as to what constitutes exemplary
damages has been considered at length in a number
of Michigan cases. In *Detroit Daily Post Company
v. McArthur* (1868), 16 Mich 447, an action for
libel, the Court said (p 453):

"It is in connection with the various degrees of
blameworthiness chargeable on wrongdoers, that
the discussions have arisen upon the subject of vin-
dictive or exemplary damages, which, inasmuch as
they rest upon actual fault, are by some authorities
said to be designed to punish the wrong intent,
while, according to others, the damages usually so
called are only meant to recompense the sense of in-
jury which is in human experience always aggra-
vated or lessened in proportion to the degree of
perversity exhibited by the offender. While the
term exemplary or vindictive damages has become
so fixed in the law that it may be difficult to get rid
of it, yet it should not be allowed to be used so as to
mislead, and *we think the only proper application
of damages beyond those to person, property or
reputation, is to make reparation for the injury to
the feelings of the person injured. This is often the
greatest wrong which can be inflicted.*" (Emphasis
added.)

In *Welch v. Ware* (1875), 32 Mich 77, an action
for assault and battery, the Court, in discussing the
right to recover exemplary damages, said (pp 84,
85):

"When the law gives an action for willful wrongs,
it does it on the ground that the injured person
ought to receive pecuniary amends from the wrong-

doer. *It assumes that every such wrong brings damage upon the sufferer, and that the principal damage is mental, and not physical.* And it assumes further that this is actual, and not metaphysical damage, and deserves compensation. When this is once recognized, it is just as clear that the willfulness and wickedness of the act must constitute an important element in the computation, for the plain reason that we all feel our indignation excited in direct proportion with the malice of the offender, and that the wrong is aggravated by it." (Emphasis added.)

In *Scripps* v. *Reilly* (1878), 38 Mich 10, an action for libel, Justice MARSTON, writing for a unanimous Court, set forth a summary of the rules applicable to the recovery of damages. Rules 1 through 6 are pertinent here. They read as follows (pp 23 and 24):

"1. In any injury entitling the party to redress, damages to the person, property and reputation, together with such special damage as may be shown are recoverable.

"2. Where the act done is one which from its very nature must be expected to result in mischief, or *where there is* malice, or *willful or wanton misconduct, carelessness or negligence so great as to indicate a reckless disregard of the rights or safety of others, a new element of damages is allowed, viz.: for injury to the feelings of the plaintiff.*

"3. *Damages for injuries to feelings are only allowed in those torts which consist of some voluntary act or very gross neglect,* and depend in amount very much upon the degree of fault evinced by all the circumstances.

"4. Where the tort consists of some voluntary act, but no element of malice, carelessness or gross negligence, is shown to have existed, but that the wrong was done in spite of proper precaution, the damages to be awarded on account of injured feel-

ings, will be reduced to such sum as must inevitably have resulted from the wrong itself.

"5. Where, however, the elements exist *in a case, entitling a party to recover damages for injured feelings, the amount to be allowed for* shame, *mental anxiety,* insulted honor, and *suffering and indignation consequent on the wrong, may be increased* or aggravated *by the* vindictive feelings, or the *degree of* malice, *recklessness, gross carelessness or negligence of the defendant,* as the injury is much more serious where these elements, or either of them, are shown to have existed.

"6. *This increase of damages dependent upon the conduct of the defendant must be considered in this State as actual damages, although usually spoken of as exemplary,* vindictive or punitory, and *the amount* thereof *to be recovered,* where recoverable at all, as they are incapable of ascertainment by any other known rule, *must rest in the fair and deliberate judgment and discretion of the jury acting upon their own sense of justice in view of all the circumstances,* both mitigating and aggravating, appearing in the case, and which can fairly be said to give color to or characterize the act, aided, however, by such instructions from the court as will tend to prevent the allowance of damages merely fanciful, or so remote as not fairly resulting from the injury." (Emphasis added.)

In *Lucas* v. *Michigan Central R. Co.* (1893), 98 Mich 1, an action by a passenger who claimed he had been wrongfully ejected from a train by the conductor, this Court said (p 4):

"Under the circumstances of this case, if the jury believed the testimony introduced on behalf of plaintiff, *the plaintiff was entitled to recover, not only those damages which are ordinarily termed 'actual damages,' but for whatever injury to his feelings or of indignity, pain, and disgrace such conduct would tend to produce in view of the time, place,*

*and circumstances.*  Conduct may be so hasty and
ill-timed, and so far disregard proper precaution
and the rights of others, as to be reckless and op-
pressive, and the law regards recklessness and op-
pression as aggravating the injury. [Citations
omitted.]  If plaintiff's legal rights were violated
by the expulsion from the train, it was for the jury
to consider the injury to his feelings that such con-
duct would be likely to produce, in view of his con-
sciousness that he was without fault, and had a
right to remain upon the train to his destination."
(Emphasis added.)

Finally, in the more recent case of *McFadden* v.
*Tate* (1957), 350 Mich 84, which was an action for
damages arising from an assault and battery, Jus-
tice CARR, writing for the Court said (p 91):

"Plaintiff was entitled to reasonable compensation
for pain and suffering undergone by him and, like-
wise, if the injury was maliciously and wantonly in-
flicted, for the sense of indignity and humiliation
resulting to him."

From the above quoted discussions from Michi-
gan cases, it must be concluded that allowance of
exemplary damages in a proper case is made for in-
jury to the feelings of a plaintiff.  It should be
further noted that this Court has held that such a
right of recovery is restricted to the person who
has received the physical injury. *Hyatt* v. *Adams*
(1867), 16 Mich 180.  This Court has also stressed
again and again that such exemplary damages are
not to be allowed by way of punishment of defend-
ant.  See *Stilson* v. *Gibbs* (1884), 53 Mich 280; *Wil-
son* v. *Bowen* (1887), 64 Mich 133; *Stuyvesant* v.
*Wilcox* (1892), 92 Mich 233; *Boydan* v. *Haberstumpf*
(1901), 129 Mich 137; *McChesney* v. *Wilson* (1903),
132 Mich 252; *Hink* v. *Sherman* (1911), 164 Mich
352; and *Wise* v. *Daniel* (1922), 221 Mich 229.

Defendant Miranda maintains that exemplary damages in Michigan at common law have been allowed only in cases involving intentional torts. The right to recover exemplary damages arises out of the outrageous nature of the acts of a defendant. Such acts are variously described in the cases: "the degree of perversity exhibited by the offender" (*Detroit Daily Post Company, supra*); "the willfulness and wickedness of the act" (*Welch, supra*); "willful or wanton misconduct, carelessness or negligence so great as to indicate a reckless disregard of the rights or safety of others  *  *  *  very gross neglect  *  *  *  carelessness or gross negligence  *  *  *  recklessness" (*Scripps, supra*); "Conduct may be so hasty and ill-timed, and so far disregard proper precaution and the rights of others, as to be reckless  *  *  *  and the law regards recklessness  *  *  *  as aggravating the injury" (*Lucas, supra*); and "injury  *  *  *  maliciously and wantonly inflicted" (*McFadden, supra*).

The above described conduct usually, but not necessarily, involves the element of an intent to do injury to a specific person. This is by no means always the case, however, especially in this day and age when instrumentalities under the control of an individual—such as an automobile—can be so recklessly and wantonly used as to endanger and injure whoever is unfortunate enough to encounter the wrongdoer. As we have seen, gross negligence or wilful and wanton misconduct in the operation of an automobile, because it can be an impersonal disregard for the life and limb of other persons, has come to be defined as a "willful and wanton disregard for public safety." "In all cases where an act is done which from its very nature must be expected to result in mischief, or where there is negligence so great as to indicate a reckless disregard of the rights

or safety of others, a new element of damages is allowed to be considered." *Detroit Daily Post Company, supra.* When conduct of this kind occurs, it matters little to the innocent injured person that he or she is the victim of acts lacking in any specific intent by defendant to inflict injury upon him. This is not the mechanical action of delivering a blow from the arms of a windmill referred to in *Welch, supra,* or the kick in the face by bovine reaction of a cow referred to in *Wise, supra*—rather this is the act of a human being having the mentality to comprehend the nature of an act in utter disregard for public safety. It transcends mere negligence.

We have permitted recovery of exemplary damages for unnecessary suffering arising when a man misconceives his legal rights and proceeds in an oppressive fashion, *Raynor* v. *Nims* (1877), 37 Mich 34. In the present situation, where it could be concluded that defendants deliberately flaunted the law, the unfortunate victim should be allowed to recover damages, mental as well as physical, resulting from the injury. Since 1868, this Court has recognized that injury to the feelings "is often the greatest wrong which can be inflicted."

It is defendant-appellee's further contention that plaintiff failed to plead exemplary damages, that exemplary damages are items of special damage governed by GCR 1963, 112.8, and that it is required they be specifically pled. Defendant cites *Sherman* v. *Kilpatrick* (1885), 58 Mich 310. The opinion in *Sherman* contains no cited authority. The case has never been cited by this Court. The correct rule is set forth in *Wise* v. *Daniel* (1922), 221 Mich 229. In that case it was claimed that the declaration made no claim of exemplary damages and, therefore, none could be awarded. The Court said (p 234):

"The declaration sufficiently averred the nature of the acts on the part of the defendant authorizing exemplary damages. The accompanying circumstances aggravating the injury by reason of the wanton and malicious conduct of the defendant need not be specially pleaded for they are not substantive elements of damages, but only serve in the capacity of characterizing the acts complained of and as an aid in measuring compensation to be awarded."

In this case, the complaint avers the gross negligence and wanton misconduct of Jones and Miranda and that Ollie Mae Smith sustained personal injuries, both physical and mental, which caused her past and future pain and suffering. Based upon the authority of *Wise, supra,* the complaint was sufficient.

Finally, defendant-appellee asserts that there was absolutely no testimony from which a jury could find that plaintiff, Ollie Mae Smith, suffered injury to her feelings as a result of the actions of defendants. Mrs. Smith testified that at the time of the injury she was seated on her front porch combing the hair of her little girl. The questions and answers continue as follows:

"*Q.* After you completed combing Tamera's hair, what did you do?
"*A.* When I finished Tamera's hair, she got down, then I started combing Karen's hair.
"*Q.* How old was Tamera at that time?
"*A.* Tamera was about four.
"*Q.* Where did Tamera go after you put her down?
"*A.* She was standing on the steps.
"*Q.* What happened next?
"*A.* She was standing on the steps, I was sitting there combing Karen's hair, all at once I heard something bump. I looked up, when I looked up this car was headed straight to me and my baby

sitting on the chaise lounge so I grabbed her in my arms. I ran to the door, just as I attempted to open the door, something hit me on the leg. Tamera was standing on the steps. My husband came from work. I was trembling, crying and screaming, she was crying. I thought she was under the car, I thought she was down under the car but she had gone in the house with her dad.

"Q. Go ahead, what happened?

"A. So then after I found out she was gone in the house with her Dad, Karen was still scared. Tamera was screaming so I took her. We was just standing there shuddering, with the girls. My cousin next door, she ran the beauty shop, one of the police come up to the porch, he said, anybody hurt up there.

"Q. Now, and with respect to anybody else, don't tell us what they said because you are not allowed to tell us what they said, but tell us what happened.

"A. Police come, say is anybody hurt. I said I don't know I am so nervous, I don't know what to do. About that time I looked down, blood was running down my leg."

In this case, a mother was seated with two of her small children on her own front porch when the intrusion occurred. The circumstances of that intrusion were such, according to the testimony, that a jury could find she suffered both physical and mental injury.

Upon new trial, the jury should be properly instructed as to exemplary damages in accordance with this opinion.

I agree with Justice Kelly that the case must be reversed and remanded for a new trial. However, I would do so, in addition to the reasons given by him, because the trial judge erred in refusing to allow the jury to consider the question of whether the actions of Miranda amounted to gross negligence

or wilful and wanton misconduct on his part as a joint tort-feasor with Jones and because the judge refused to charge the jury as to exemplary damages.

T. M. KAVANAGH, J., concurred with ADAMS, J.

BLACK, J. (*concurring specially in reversal and remand*). With Justices KELLY and ADAMS I vote to reverse and remand for new trial.

My separate view is that the trial judge erred reversibly in refusing to submit to the jury question whether defendant Miranda's conduct rendered both defendants joint tort-feasors according to common-law standards. The conduct to which I refer is outlined, favorably to the plaintiff as is due for present purposes, in Justice ADAMS' opinion.

I find no other evidence of reversible error.

Plaintiff should have costs of all courts thus far sustained.

T. G. KAVANAGH, J., took no part in the decision of this case.