836 F.2d 1348
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Leonard J. MILLER, Individually and Dearborn Canvas Products
a/k/a Dearborn Canvas Products Company and d/b/a
American Cover Co. a/k/a American Cover
Company, Plaintiffs-Appellees,
v.
TONG SEAE INDUSTRIAL COMPANY, LTD., et al., Defendants-Appellants.
 No. 86-1755.
 United States Court of Appeals, Sixth Circuit.
 Jan. 4, 1988.
 
 Before KEITH and ALAN E. NORRIS, Circuit Judges, and GIBBONS, District Judge.*
 PER CURIAM.
 
 
 1
 Appellants Tong Seae Industrial Company, Ltd., a Taiwanese corporation, USA Poly International, Inc., a California corporation, Tong Seae (U.S.A.), Inc., a California corporation, and Tony Yeh appeal the decision of the district court in this diversity case arising out of appellants' sale of raw materials and finished swimming pool covers to appellee Leonard Miller and his two sole proprietorships, Dearborn Canvas Products Company and American Cover Company, located in Taylor, Michigan. The trial court found that the corporate defendants-appellants and the individual defendant-appellant Tony Yeh were liable for breach of contract, breach of express and implied warranties and fraud and awarded compensatory and punitive damages. Appellants challenge the trial court's findings of fact and application of law to the facts, particularly with respect to calculation of damages and the award of several elements of damage.
 
 
 2
 The parties' relationship began in 1979 when appellant Tony Yeh contacted appellee Leonard Miller to urge him to use Tong Seae, Taiwan, as his supplier of material for use in the manufacture of bubble pool covers. Yeh convinced Miller that his previous supplier's product was inferior to the Tong Seae product. The parties agreed that Miller would buy a particular quantity of pool cover material of a particular thickness.
 
 
 3
 When Miller sought to use the material, he found a number of problems, including depressed bubbles and split rolls. He also found that he had paid for more length than was sent. Miller cut out the damaged parts and used the rest. When he complained to Yeh, Yeh assured him that he would remedy the problems and ship extra material to replace the unusable portions. Satisfied with these promises, Miller placed a second order in July 1979.
 
 
 4
 The second shipment displayed the same problems as the first. In response to Miller's complaint, Yeh again assured him that the material was not defective and that he would replace any shortage.
 
 
 5
 In December 1979, Miller placed another order with Yeh for both material and finished pool covers. The material again had the same quality problems, and on January 22, 1980, Miller sent Yeh a mailgram asking him to "stop all shipments. Very serious matter. Call me immediately." Yeh again promised to make corrections and send more material of better quality.
 
 
 6
 On February 20, 1980, Miller cabled Yeh that all shipments of finished covers should be stopped.[1] Miller at that time was receiving complaints from customers of seam separation and deterioration and delamination of the basic material. Yeh again promised correction.
 
 
 7
 Miller continued to do business with Yeh throughout 1980, although he continued to encounter and complain of problems--shortage of yardage, difficulty heat-sealing the materials and material less than the designated thickness. At times Miller received extra material, but it was also of poor quality. Customers were still complaining. On April 9, 1980, Tony Yeh sent Miller a cablegram that stated:
 
 
 8
 Deeply apologize for bad quality and shortage. Fully guarantee replacement for shortage and quality improvement. (emphasis in original).
 
 
 9
 The situation became worse in early 1981. Miller learned in April that Yeh's companies had been selling material to a competitor at a very low price. One of Miller's largest customers, Sun Wholesale Supply Company of Clearwater, Florida, was threatening Miller with a lawsuit over the quality of the pool covers it had been receiving. These covers had been purchased from appellants. Yeh went with Miller to Florida, but did not appear to Miller to be very concerned about the problem. After Miller and Yeh had agreed that the defective covers should be returned to Yeh's company in California, Yeh told his people there to refuse shipment. Finally, in July 1981, Miller notified Yeh that he was revoking acceptance of the goods and broke off relations with Yeh.
 
 
 10
 The record establishes that all three of the corporate appellants shipped material to appellees during the course of their business relationship. At the outset the shipments were from Tong Seae Industrial Company, Ltd; later USA Poly International, Inc., and then Tong Seae (USA), Inc., shipped material. During the course of the parties' relationship, appellees dealt almost exclusively with Tony Yeh. Although Yeh at times held himself out as a representative of those corporations, some of appellees' payments for material were by check to Tony Yeh personally. Yeh suggested that this be done because alleged employee misappropriations involving his California companies had left him unable to meet his basic financial obligations for those companies. He also told Miller that he needed the money to go forward with plans for a proposed partnership with Miller. In particular, appellees paid Yeh $14,628.00 on September 22, 1979; $30,000.00 in January 1980; $22,656.00 on April 18, 1980; $25,000.00 on May 27, 1980; $4,900.00 on May 30, 1980, and other amounts in October and November 1980 and February 1981. On one occasion in November 1980, Yeh personally entered into an agreement with Miller concerning the shipment of goods and purchase of a heat-sealing machine (Exhibit 55).
 
 
 11
 As early as September 1979, Yeh talked to Miller about becoming a fifty-percent partner in Yeh's California operation. The possibility was discussed again in November of 1979. An agreement was even drafted, but Yeh never signed. There was also talk of Miller's becoming Yeh's exclusive dealer in Canada and the United States.
 
 
 12
 Yeh also interested Miller in becoming a fifty-percent partner in the purchase of a new heat-sealing machine. Miller paid $20,000.00 into Yeh's personal account toward the development of the machine and constructed an $82,000.00 addition to his plant in Michigan to house it. Miller never received the machine, and Yeh would not refund the $20,000.00.
 
 
 13
 Miller and Yeh were friends as well as business associates. A number of their written communications discuss visits and refer affectionately to family members. Miller and Yeh refer to each other as "brother." Miller attended Yeh's wedding and loaned him $5,000.00 to buy a car. At trial, Miller stated that he continued to do business with Yeh despite the poor quality of the products because of Yeh's repeated promises to make good, the fact that Miller could not find raw materials through other sources to fill his orders, and in consideration of the money he had already invested to further the plan for the California partnership.
 
 
 14
 After a four-day trial, the district court made oral findings of fact and conclusions of law. Applying Michigan law, the court ruled first that appellants breached their contract with appellees by furnishing defective bubble material and pool covers and failing to repair or replace them. The court then ruled that appellants had breached an implied warranty of fitness for a particular purpose. The basis for the existence of this warranty was Tony Yeh's knowledge that the goods were to be distributed to customers for use as swimming pool covers. The court also ruled that appellants breached express warranties regarding the thickness of the product and its quality. Third, the court found a breach of contract by appellants in failing to provide appellees the heat-sealing machine for which appellees paid $20,000.00. Fourth, the court found that appellants committed fraud in two respects--the numerous misrepresentations about correcting the problems with the goods and the representation that Yeh would make Miller a partner in one or more of his California corporations. The court noted that Yeh admitted the promise to make Miller a partner and added that he never intended to do so.
 
 
 15
 The court found that all appellants were jointly and severally liable on all theories. it noted that appellees dealt with all the corporate parties and that throughout the parties' entire relationship Yeh acted as a principal on behalf of the corporations and on his own behalf.[2] Thus, the court found a basis for imposition of liability against Yeh personally and against the corporations as well.
 
 
 16
 The court specifically found Miller to be a much more credible witness than Yeh. Although appellants presented no proof, Miller called Yeh as a witness and the court had ample opportunity to evaluate the demeanor and testimony of both men. The court said that Yeh's answers were "contradictory ... illogical and defied belief," while Miller was "forthright ... logical ... and reasonable."
 
 
 17
 The court calculated damages as follows. Appellees' "out-of-pocket" expenses were set at $227,149.91. This figure included $196,271.00 paid for material remaining in appellees' possession, $36,400.00 in warehousing costs, $3,412.15 for replacement covers for covers rejected by a customer, and $9,062.76 credit due to American Cover Company.[3]
 
 
 18
 In addition to "out-of-pocket expenses, the court awarded $82,000.00, the construction cost of the building erected to house the heat-sealing equipment, as consequential damages. The court further awarded $20,000.00 for breach of the contract for the heat-sealing equipment. The $20,000.00 was awarded under count 3 of the complaint, which related only to the heat-sealing equipment, while the $82,000.00 was awarded under counts 1 and 2, the counts alleging breach of contract and warranty in the agreement to furnish bubble material and pool covers.
 
 
 19
 With respect to count 5, the fraud count, the court awarded compensatory damages of $309,149.91, the same amount as the total damages awarded under counts 1 and 2,[4] and punitive damages of $200,000.00.
 
 
 20
 The court awarded pre-judgment interest and attorneys fees on counts 1, 2, and 3; the pre-judgment interest totalled $266,306.84. The total judgment entered was $795,456.75 plus attorneys' fees of $3,375.00 and costs.
 
 
 21
 Appellants challenge virtually all of the district court's findings and conclusions. With respect to liability, they first argue that there was no evidence that appellants breached their contract with appellees and that appellees' attempted revocation of acceptance of the goods in question was ineffective. They assert that the trial court erred in finding that express and implied warranties existed, that appellants breached those warranties, and that appellees had given timely notice of breach. Finally, they argue that appellants' representations about replacement and improvement of the goods and about a possible partnership with Yeh did not constitute fraud. Rule 52(a) of the Federal Rules of Civil Procedure provides that "findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." After a scrutiny of the trial record, we conclude that the trial court's findings of fact as to liability were not clearly erroneous. Nor do we find any error in the trial court's application of the law on the liability issues.
 
 
 22
 We turn then to a discussion of damages. Appellants argue strenuously that the trial court, in awarding damages under counts 1 and 2, did not apply the proper measure of damages for breach of contract or breach of warranty. Appellants also contend, and appellees concede, that the trial court incorrectly failed to deduct salvage value of certain merchandise from the damage award. Further, appellants assert that the award of $82,000.00 for the plant addition was an improper award of consequential damages because the addition, in fact, enhanced the value of the property. Finally, appellants argue that the trial court improperly awarded punitive damages, since such damages are not allowed under Michigan law.
 
 
 23
 This case must be remanded for a reconsideration of the damage issues for several reasons. First, the court did not specify the applicable measure of damages with respect to counts 1 and 2. Its failure to do so makes review of the damage award virtually impossible. In part, this difficulty arises from the relationship between the damage issues and the revocation issue. Although appellants argue that the trial court incorrectly found revocation of acceptance, the trial court made no findings with respect to revocation. It did, however, find that timely notice of breach had been given. The most reasonable interpretation of the court's oral ruling is that the court believed that no effective revocation of acceptance had occurred. Assuming this interpretation is correct, the damage award for counts 1 and 2 is governed by Mich.Comp. Laws Sec. 440.2714 (1967). That statute provides:
 
 
 24
 (1) Where the buyer has accepted goods and given notification (subsection (3) of section 2607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
 
 
 25
 (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
 
 
 26
 (3) In a proper case any incidental and consequential damages under the next section may also be recovered.
 
 
 27
 Although Sec. 440.2714(2) sets out the ordinary measure of damages for breach of warranty, both Sec. 440.2714(1) and (2) permit some latitude in selection of an appropriate measure of damages. See Mich.Comp. Laws Sec. 440.2714 comment 3 (1967). Without specification by the court of the legal standard utilized for calculation of damages, the justification for the use of that standard, and the legal basis for the award of each element of damage, we are unable to review appropriately the award of damages.[5] The calculation of damages on remand should obviously take into account the $18,000 received by appellees for certain merchandise sold as scrap.
 
 
 28
 The damages awarded for the plant addition were an appropriate consequential damage award. Yeh suggested to Miller that the addition should be built to house the heat-sealing equipment since Miller did not have sufficient space for it; thus he plainly had knowledge of the need for the addition. Despite references to enhancement of the value of appellees' property by the court and by appellees' counsel in closing argument, the record contains no evidence that the value of the property was enhanced.[6] Miller testified that he had no use for the addition and was using it to house defective material received from appellants. Under these circumstances the consequential damage award of $82,000.00 was proper.[7] See Mich.Comp. Laws 440.2715 (1967).
 
 
 29
 Reconsideration of the punitive damage award is also required. Under Michigan law no punitive damage award is permitted for the purpose of punishing a defendant. Smith v. Jones, 382 Mich. 176, 204, 169 N.W.2d 308, 319 (1969); Gilroy v. Conway, 151 Mich.App. 628, 636, 391 N.W.2d 419, 422 (1986); Peisner v. Detroit Free Press, 68 Mich.App. 360, 371, 242 N.W.2d 775, 780 (1976). Thus, while some Michigan courts use the term "punitive damages," see Peisner, 68 Mich.App. at 371, 242 N.E.2d at 780, the more accurate term is exemplary damages. See, e.g., Kewin v. Mass. Mutual Life Ins. Co., 409 Mich. 401, 419-20, 295 N.W.2d 50, 74-75 (1980); American Central Corp. v. Stevens Van Lines, Inc., 103 Mich.App. 507, 514-15, 303 N.W.2d 234, 237 (1981); Ray v. City of Detroit, 67 Mich.App. 702, 704, 242 N.W.2d 494, 495 (1976). Whatever term is used, however, the proper purpose of such damages in Michigan is to compensate a plaintiff for injury to feelings. Kewin, 409 Mich. at 419, 295 N.W.2d at 74-75; Green v. Evans, 156 Mich.App. 145, 152-53, 401 N.W.2d 250, 253 (1985). Here the trial court indicated that it was awarding punitive damages, yet gave no indication of its basis for doing so. Thus, this court cannot determine whether the damage award was intended to punish defendants, an impermissible purpose under Michigan law, or to compensate plaintiffs for injury to their feelings as a result of defendants' fraud, an appropriate purpose.
 
 
 30
 The trial court's findings of fact and conclusions of law with respect to the various liability issues are affirmed. The case is remanded for further proceedings on the damage issues in accord with this opinion.
 
 
 
 *
 The Honorable Julia Gibbons, Judge, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Apparently Miller never received any of the finished covers ordered in December 1979. Joint Appendix at 299. Later, between August 1980 and March 1981, finished covers were received
 
 
 [2]
 As an example of the manner in which Yeh handled his business dealings, the court noted that the exhibits included correspondence from Yeh on the letterhead of one corporation, with the body of the letter indicating he was writing on behalf of another
 
 
 [3]
 Using the trial court's figures, this court cannot arrive at "out-of-pocket" expenses of $227,149.91. Appellants do not raise this possible mathematical error on appeal, however, but challenge the method of calculation of damages
 
 
 [4]
 Although the court's oral ruling was not specific on this point, the subsequent judgment specified that the compensatory damages awarded under count 5 were not in addition to those awarded under counts 1 and 2
 
 
 [5]
 Since the trial court awarded the same amount of damages under count 5 as it awarded under counts 1 and 2, it is appropriate to remand all of the damage issues for reconsideration rather than allowing the compensatory damage award under count 5 to stand
 
 
 [6]
 Miller's testimony on direct examination was the only evidence at trial about the addition. Appellants' trial counsel did not ask Miller a single question about the $82,000.00 figure on cross-examination. Yeh did not mention the $82,000.00 addition in his testimony
 
 
 [7]
 The trial court mistakenly awarded the $82,000.00 under counts 1 and 2, however. Count 3, rather than counts 1 and 2, relates to the heat-sealing equipment and the $82,000.00 was an appropriate element of consequential damages for the breach compensated under that count